# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| BERNARD SHINER, *et al.*, | ) | Case No.1:19-cv-1591 |
| | ) | |
| Plaintiffs, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge Thomas M. Parker |
| | ) | |
| BASF CATALYSTS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

Plaintiffs Bernard Shiner and his wife Tami Shiner sued Defendant BASF Catalysts, LLC, after Mr. Shiner was injured delivering caustic soda to BASF's facility outside Cleveland, Ohio.  Mr. Shiner worked for an independent contractor that is not a party to this action and claims Defendant's negligence resulted in his injuries.  Defendant seeks summary judgment, arguing that it owed no duty to Mr. Shiner.  The Court heard oral arguments on the motion on September 16, 2021. For the reasons explained below, the Court **GRANTS** Defendant's motion.

## STATEMENT OF FACTS

Mr. Shiner worked for Hazmat Environmental Group, an independent contractor that delivers chemicals to facilities like the one BASF operates.  (ECF No. 22-1, PageID #239.)  At the time of his injury, Mr. Shiner had done so for almost 30 years.  (ECF No. 22-1, PageID #238; ECF No. 22-2, ¶ 2, PageID #327.)  By then, he had been to BASF's facility in Elyria, Ohio at least twenty times.  (*Id.*, PageID

#254.)  At that facility, BASF uses caustic soda in manufacturing environmental and process catalysts.  (*See generally* ECF No. 21-1, PageID #148–50.)

### A.      The Delivery Process

Every time Mr. Shiner delivered chemicals to BASF, he followed the same process.  (ECF No. 22-2, ¶ 2, PageID #327.)  Wearing a hard hat and safety goggles, Mr. Shiner climbed on top of his tanker to open a valve.  (ECF No. 22-1, PageID #251–52.)  He then got down, hooked up an air line to his truck and trailer, and went back to the driver's side of the truck to put on the remainder of his personal protective equipment.  (*Id.*, PageID #252.)  Mr. Shiner donned a chemical suit, boots, hard hat, face shield, gloves, and a respirator before transferring the chemicals from his truck. (*Id.*)  This protective equipment diminished Mr. Shiner's field of vision somewhat and his ability to bend his head down.  (*Id.*, PageID #247; ECF No. 22-2, ¶ 3, PageID #327.)  In his protective gear, Mr. Shiner appears as follows:



(ECF No. 22-1, PageID #321.)  Hazmat Environmental Group provided Mr. Shiner with his protective equipment.  (*Id.*, PageID #245.)

Then, Mr. Shiner connected the air line from BASF to his trailer.  (*Id.*, PageID #251–52.)  He routinely hooked the heavy chemical hose from his truck to BASF's inlet line and connected the other to an outlet at the back of his trailer.  (*Id.*, PageID #252.)  Mr. Shiner laid the hose on the ground between the jersey barriers that separate the BASF receiving area from the parking lot.  (ECF No. 22-2, ¶4, PageID #328.)  Once the trailer pressurized, a BASF employee opened the valves to the transfer lines, signaled to Mr. Shiner, who then opened the valves on his trailer and began offloading the chemicals.  (ECF No. 22-1, PageID #252.)

When completed, Mr. Shiner repeated this process in reverse.  He and a BASF employee signaled one another to close their valves.  (*Id.*, PageID #257.)  He unhooked the hoses from the valves at the shed and his truck, rinsed them out, then wound them up.  (*Id.*, PageID #259, 261.)  Disconnecting the hoses and preparing to wash them out took about three minutes, during which time Mr. Shiner's back was turned to his truck.  (*Id.*, PageID #252–53, 267.)  When he moved between his truck and the valves at the shed, Mr. Shiner walked between the concrete barriers; he did not step across them or on them.  (*Id.*, PageID #261.)  The offloading process itself took between thirty and forty-five minutes (ECF No. 22-1, PageID #253), or perhaps as much as an hour and a half (ECF No. 22-3, PageID #359).  During this process, red barrier tape roped off the area, and a BASF employee watched from the shed to which

3

the valves are attached.   (ECF No. 22-3, PageID #362–63; ECF No. 22-4, PageID #476.)

The following photograph shows the delivery area at BASF where this process takes place:



(ECF No. 22-1, PageID #323.)  This photo is taken from the place where a truck would back in for the unloading, looking at the shed where the BASF operator sits during that process and where the inlet valves are located.  The concrete barriers separate the truck parking area from the inlets and the shed.

### B.    June 8, 2017

On June 8, 2017, while Mr. Shiner was waiting for the caustic soda unloading to complete, he sat and waited on a cement barrier between BASF's control center and where his truck and trailer were parked.  (*Id.*, PageID #256.)

### B.1.  Completion of the Offloading Process

As usual, when the unloading process finished, Mr. Shiner shut off the air line to the truck, unhooked it, and placed it on the ground.  (*Id.*, PageID #258.)  He went to the controls outside the shed, unhooked the air hose on BASF's end and laid it in a sump (a drain in the ground), then closed and capped the lines from BASF's shed. (*Id.*)  When he unhooked the chemical hose from BASF's inlet, he placed it in the same sump as the air hose.  (*Id.*, PageID #259.)

He went back to the trailer of his truck, unhooked the chemical hose, capped off the truck, and pinned the hose up "against the back of the trailer" kind of "pinched between the truck and the bumper."  (*Id.*, PageID #258–60.)  Returning to the controls outside the shed, Mr. Shiner crossed between the concrete barriers, wound up the air hose from BASF, unwound the water hose, and prepared to wash the unloading equipment, including the soda hose.  (*Id.*, PageID #260–61.)

### B.2.  Mr. Shiner Falls and Injures His Knee

During the three minutes his back was to his truck, Mr. Shiner saw a BASF employee walk past him and go up the stairs to the shed.  (*Id.*, PageID #267.)  He did not see this employee touch any of his equipment.  (*Id.*, PageID #269.)  What happened next gives rise to the dispute between the parties.

### B.2.a. Mr. Shiner's Testimony

As Mr. Shiner collected one of the hoses and made his way back to his truck, the other hose was not where he left it or normally leaves it.  (*Id.*, PageID #262.)  Instead, "it was laying up on top of the concrete barriers."  (*Id.*)  Mr. Shiner testified that, as he walked between two of the concrete barriers, his chemical hose "was laying

up on top of the concrete barriers, and I tripped right over the top of it." (*See id.*, PageID #261, 262; *see also id.*, PageID #263.)  He explained that he walked sideways between the barriers and, when he got past them, he "turned to face the truck, and I did not see the hose at my feet.  It was right there." (*Id.*, PageID #264.)

### B.2.b. Mr. Shiner's Corrected Testimony

After a break, Mr. Shiner corrected his testimony.  (*Id.*, PageID #266.)  He testified that he walked straight forward between the barriers, "one foot ahead of the []other," looking at his truck—not sideways.  (*Id.*, PageID #267.)  He did not see the hose resting up against his truck, which is where he had expected it to be.  (*Id.*)  This photo shows the location of the hose when Mr. Shiner tripped over it:



BASF00047

6

(*Id.*, PageID #326.)  After he tripped, Mr. Shiner screamed, "Who moved the hose?" (*Id.*, PageID #275.)  He also testified that he did not see anyone touch or move the hose.  (*Id.*, PageID #272.)

### B.2.c. The Testimony of BASF's Employee

John Hrivnak, an employee of BASF working at the receiving shed that day, did not recall seeing Mr. Shiner fall, but remembered standing up and looking out from the shack "right after he fell."  (ECF No. 22-3, PageID #380.)  He recalled that Mr. Shiner was "laying on the ground" on his "stomach looking west, towards the back of the trailer."  (*Id.*, PageID #381.)

As for the events preceding the fall, Hrivnak remembered that the chemical hose "was disconnected already" and that Mr. Shiner had "started to load the hose up[,]" but "stopped at that point" before loading the hose into the tray on the side of his trailer.  (*Id.*, PageID #385.)  Hrivnak did not see a BASF employee move the hose. (*Id.*, PageID #388.)

### C.    Mr. Shiner's Injuries

After the fall, Hrivnak called 911, then proceeded down to the unloading area to assist Mr. Shiner, who had gotten himself up off the ground and onto one of the concrete barriers.  (ECF No. 22-1, PageID #276.)  Mr. Shiner removed some of his personal protective equipment, including his hard hat, face shield, and gloves.  (*Id.*, PageID #277.)  EMS arrived a short time later and treated Mr. Shiner at the scene before taking him to University Hospitals in Elyria, where he was treated for a broken kneecap.  (*Id.*, PageID #280–81; *see also id.*, PageID #313.)

Due to his injuries, Mr. Shiner has not returned to work.  (*Id.*, PageID #240–41.)  His fractured kneecap required six surgeries.  (*Id.*, PageID #313.)

## STATEMENT OF THE CASE

Plaintiffs filed suit in State court, asserting causes of action for (1) negligence and (2) loss of consortium.  (ECF No. 1-1, PageID #13–14.)  Plaintiffs claim that, because a BASF employee moved the chemical hose over which Mr. Shiner tripped, the company either created or permitted a dangerous situation to exist.  (ECF No. 1-1, ¶¶ 21–22, PageID #13.)  Defendant timely removed based on diversity jurisdiction under 28 U.S.C. § 1332(a).  (ECF No. 1, PageID #1.)  After abbreviated discovery related only to BASF's duty, if any (ECF No. 20), Defendant now moves for summary judgment (ECF No. 21).

## JURISDICTION

"Federal courts have limited jurisdiction, possessing only that power the Constitution and statutes authorize."  *Hall v. OrthoMidwest, Inc.*, ___ F. Supp. 3d ____, 2021 WL 2093444, at *2 (N.D. Ohio May 24, 2021) (citing *Kokkonen v. Guardian Life Ins. Co of Am.*, 511 U.S. 375, 377 (1994)).  Because of the limited jurisdiction of the federal courts, the Court has an independent obligation to examine its own jurisdiction to ensure it has the authority to proceed.  *See, e.g.*, *Nikolao v. Lyon*, 875 F.3d 310, 315 (6th Cir. 2017) (citations and quotations omitted).

One source of statutory jurisdiction comes from 28 U.S.C. § 1332(a), which permits a federal court to hear claims between citizens of different states if the amount in controversy exceeds $75,000.  A case that satisfies both of these requirements in the first place, but is initiated in State court, can be removed under

8

28 U.S.C. § 1441(a).  Jurisdiction is assessed at the time the case is removed.  *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210 (6th Cir. 2004).

Although the parties are diverse, the Court had a question about the amount in controversy.  (Mar. 24, 2021 Dkt. Entry.)  The complaint prays for damages in an amount exceeding $25,000.  (ECF No. 1-1, PageID #13.)  Based on the elements of the damages Plaintiffs claim, including Mr. Shiner's salary and the cost of the surgeries to repair his knee (ECF No. 24, PageID #632), the Court finds that the amount in controversy exceeds $75,000 for jurisdictional purposes.  Also, these damages had accrued before Plaintiffs filed suit and Defendant removed.  Therefore, the Court has jurisdiction and proceeds to the merits of Defendant's motion.

## ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, "the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Then, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial."  *Id.* (citing *Anderson*, 477 U.S. at 250).

9

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Court determines "whether the evidence presents a sufficient disagreement to require submission to a jury" or whether the evidence "is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. In doing so, the Court must view evidence in the light most favorable to the non-moving party. *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Tokmenko*, 488 F. Supp. 3d at 576 (citing *Anderson*, 477 U.S. at 250). However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper. *Id.* The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).

"Just as a plaintiff may not rely on conclusory allegations to proceed past the pleading stage, so too a plaintiff may not rely on conclusory evidence to proceed past the summary-judgment stage." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (citations omitted). "Conclusory statements unadorned with supporting facts are insufficient

to establish a factual dispute that will defeat summary judgment." *Id.* (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009).

## I.     Negligence

Under Ohio law, the elements of a negligence claim are (1) duty, (2) breach, (3) causation, and (4) damages. *See, e.g.*, *CSX Transp., Inc. v. Exxon/Mobil Oil Corp.*, 401 F. Supp. 2d 813, 818 (N.D. Ohio 2005) (citing *Mussivand v. David*, 45 Ohio St. 3d 314, 318, 544 N.E.2d 265, 269 (1989)).  Under the governing case management order, the parties focus on the question of duty.  (*See* ECF No. 20.)  "Ohio recognizes four types of entrants: business invitee, social guest, licensee, and trespasser." *Plank-Greer v. Tannerite Sports, LLC*, 103 F. Supp. 3d 886, 889 (N.D. Ohio 2015) (citation omitted).  "In Ohio, the status of the person who enters the land of another defines the scope of the legal duty the landowner owes that person." *Id.* (denying summary judgment where landowner blew up a refrigerator filled with explosives, injuring a social guest).

Ohio "law does not impose a duty on a property owner to protect an independent contractor's employee 'in connection with execution of the work, who proceeds therewith knowing and appreciating that there is a condition of danger surrounding its performance.'" *Jolly v. Dynegy Miami Fort, LLC*, 500 F. Supp. 3d 659, 668 (S.D. Ohio 2020) (quoting *Wellman v. East Ohio Gas Co.*, 160 Ohio St. 3d 103, 107, 113 N.E.2d 629, 632 (1953)), *aff'd*, ___ F. App'x ___, 2021 WL 2550405 (6th Cir. June 22, 2021).  While a property owner has a duty to keep the premises in "a reasonably safe condition" and to warn others about "dangers of which they have knowledge," that duty "does not extend to hazards which are inherently and

necessarily present because of the nature of the work performed, where the frequenter is the employee of an independent contractor." *Id.* (quoting *Eicher v. U.S. Steel Corp.*, 32 Ohio St. 3d 248, 249, 512 N.E.2d 1165, 1167 (1987)).

"In other words, the independent contractor bears the primary responsibility for protecting its employees who engage in inherently dangerous work." *Id.* (citation and quotation omitted).  Ohio has long employed this rule.  In 1953, the Ohio Supreme Court held that, "where an independent contractor undertakes to do work" that poses a "real or potential danger" and injury occurs "incident to the performance of the work, no liability for such injury ordinarily attaches to the one who engaged the services of the independent contractor." *Wellman*, 160 Ohio St. 3d at 103, 113 N.E.2d at 630, paragraph one of the syllabus.

### I.A.    Active Participation

Nevertheless, "Ohio law does not completely shield from liability those property owners who employ independent contractors to perform dangerous jobs." *Jolly,* 500 F. Supp. 3d at 668.  Where a property owner "actively participate[s] in any action or decision that led to the fatal injuries," it may be liable.  *Id.* (quoting *Cafferkey v. Turner Constr. Co.*, 21 Ohio St. 3d 110, 112, 488 N.E.2d 189, 192 (1986)).

In two circumstances, a property owner actively participates in the activities of an independent contractor such that it might have a duty:  (1) where the owner "directs or exercises control over the work activities of the independent contractor's employees"; or (2) where it "retains or exercises control over a critical variable in the workplace." *Id.* at 668 (citing *Sopkovich v. Ohio Edison Co.*, 81 Ohio St. 3d 628, 641, 1998-Ohio-341, 693 N.E. 2d 233, 243 (Ohio 1998)).

### I.A.1. BASF's Control Over Mr. Shiner's Work Activities

The first type of active participation requires a property owner to exercise "some degree of control over the independent contractor's employee's work activities." *Id.* (citing *Frost v. Dayton Power & Light Co.*, 138 Ohio App. 3d 182, 740 N.E.2d 734, 739 (2000)). "A property owner employing an independent contractor only exercises control over the contractor's employee's workplace activities if it (1) 'directed the activity which resulted in the injury' or (2) 'gave or denied permission for the critical acts that led to the employee's injury.'" *Id.* at 669 (quoting *Bond v. Howard Corp.*, 72 Ohio St. 3d 332, 337, 650 N.E.2d 416, 420–21 (1995)). In these circumstances, "active participation arises due to the hiring entity's control over work activities." *Clark v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 19AP-495, 2020-Ohio-5400, ¶ 15.

Active participation does not mean "merely exercising a general supervisory role," having some awareness "of the independent contractor's practice that created a dangerous situation," or even "exhibiting a general concern for workplace safety." *Id.* (cleaned up). Even providing materials or rendering assistance to the independent contractor's employee "is insufficient to establish active participation." *Jolly*, 500 F. Supp. 3d at 669–70 (citations omitted). "Instead, courts look at the interactions between the property owner and the contractor's employee to decide if the property owner directed or controlled that employee's workplace activities." *Id.* (citing *Sopkovich*, 693 N.E.2d at 244).

To demonstrate that BASF owed him a duty, Plaintiffs cannot merely rest on the fact that BASF owned the land or that its employees supervised the unloading of caustic soda. Instead, Plaintiffs must show that someone at BASF took an active role

in Mr. Shiner's activities.  But there is no evidence of that.  During his deposition, Mr. Shiner agreed that the extent of BASF's role involved its employees "check[ing] over" the delivery paperwork and gesturing to him when unloading was complete. (*See* ECF No. 22-1, PageID #251–55.)  Beyond that, however, BASF employees did not "say very much" to him.  (*Id.*)  Accordingly, there is no genuine dispute that BASF did not control or direct Mr. Shiner's activities or that the company gave or denied him critical permission over that process.

### I.A.2. BASF's Control Over a Critical Workplace Variable

The other type of active participation exists "where the owner retains or exercises control over a critical variable in the workplace." *Jolly*, 500 F. Supp. 3d at 699 (quoting *Sopkovich*, 693 N.E.2d at 243).   "The critical variable analysis . . . captures only those situations where a property owner *chooses* to do (or not do) something related to such critical variable, or directs or prohibits a contractor's activities related to such critical variable, during the contractor's work on the premises." *Grady v. General Motors Corp.*, 194 F.3d 1312 (Table), No. 98-4251, 1999 WL 825045, at *4 (6th Cir. 1999). Here, to demonstrate that Mr. Shiner's claim against BASF falls outside the scope of *Wellman*, Plaintiffs must show that BASF retained control over a critical variable, and the parties focus much of their arguments on this issue.

### I.A.2.a. Control in Ohio Case Law

An example from the Ohio Supreme Court illustrates the reach of this type of active participation.  In *Hirschbach v. Cincinnati Gas & Electric Co.*, 6 Ohio St. 3d 206, 207, 452 N.3.2d 326, 328 (1983), the Ohio Supreme Court ruled that a power

company had liability for injuries to an independent contractor who fell while replacing wire conductors.  There, to do the line-replacement work, the independent contractors attached a "winch line cable" to the line in the air and to a tractor on the ground, which was parked "not more than eighty to ninety feet away from the base of the tower[.]"  *Id.* at 207.  Before the contractors began this process, they requested that the property owner allow them to park the tractor some three or four hundred feet from the base of the tower because a 1:4 ratio was customary based on the height of the tower, but the owner refused.  Eventually, the winch line pulled the tower down, along with the independent contractor, killing him.  The Ohio Supreme Court held that a jury could reasonably conclude that the landowner owed the lineman a duty because it retained control over the "safety features necessary to eliminate the hazard," that it refused to do so and interfered with the job, and actually participated in the "job operation" by "dictating the manner and mode" by which the winching was done.  *Id.* at 208.  In the Ohio Supreme Court's view, this level of control and direction took the matter outside *Wellman*'s general limit on landowner duties to an independent contractor.  *See id.*

As another example, a power company has control over a critical workplace variable where it retains control over power lines near the work of an independent contractor.  *See Sopkovich*, 693 N.E.2d at 243.  So too does a general contractor retain control over a staircase without a guardrail at a construction site where an independent contractor's employees work.  *See Cefaratti v. Mason Structural Steel Co.*, 136 Ohio App. 3d 363, 366, 736 N.E.2d 913, 914 (8th Dist. 1999).  Conversely, a

moving conveyor that an independent contractor, among others, knew how to shut off does not suffice. *See Komenovich v. AK Steel Corp.*, No. CA98-08-172, 1999 WL 31139, at *5 (Ohio Ct. App. Jan. 25, 1999). Similarly, an independent contractor's atypical use of a tool provided by the landowner takes an injury outside the landowner's control. *See Jolly*, 500 F. Supp. 3d at 673.

### I.A.2.b. Facts and Circumstances

As the Ohio Supreme Court interprets this exception, it has no application here. There is no evidence that BASF gave or denied Mr. Shiner permission to do something at any point during his delivery on the day in question. Nor did BASF dictate the manner and mode of Mr. Shiner's unloading operation. In fact, Mr. Shiner recalled that he was the only one who exercised control over the unloading area and the unloading process. (ECF No. 22-1, PageID #283.)

Ultimately, demonstrating control over a critical variable depends on the specific facts and circumstances at issue. Plaintiffs argue that BASF "actively participated in [Mr. Shiner's] delivery process" when one of its employees moved the chemical hose, causing Mr. Shiner to trip and resulting in his injuries. (ECF No. 22, PageID #216.) Even assuming that the hose is a critical workplace variable, and construing the record on summary judgment in Plaintiffs' favor, there is no evidence that an employee of BASF moved the chemical hose. Crediting Mr. Shiner's revised testimony, after the break at his deposition, the hose was not where he expected it to be or where he left it. Indeed, Mr. Shiner saw a BASF employee walk past him (ECF No. 22-1, PageID #267, 269), but neither he nor Hrivnak saw anyone move the hose or any person in a position where he could have moved it (*id.*, PageID #272; ECF No.

16

22-3, PageID #388.)  Based on this record, inferring that someone must have done so depends on speculation, which is not proper evidence on summary judgment or otherwise.  *See Przybylinski v. CSX Transp. Inc.*, 292 F. App'x 485, 489 (6th Cir. 2008) (citing *River Terminal Ry. Co.*, 763 F.2d 805, 807 (6th Cir. 1985)).

The authorities applying the reach of *Wellman* confirm this conclusion.  This case more closely resembles *Jolly* and *Komenovich* than *Cefaratti* or *Sopkovich*.  At all times, Mr. Shiner had responsibility for the area where he was unloading caustic soda ash.  (ECF No. 22-1, PageID #283.)  He was also responsible for the tools and instruments he used and was in control of them at all times during a delivery.  (*Id.*, PageID #250.)  Further, Mr. Shiner and his employer were responsible for the protective equipment he wore, not BASF.  (*Id.*, PageID #249–50.)  BASF's responsibilities pertained to observing the process from the shed, making sure nobody entered within twenty feet of the truck or valves during the process, and turning a BASF valve on and off as needed.  (ECF No. 22-3, PageID #381, 394.)  A BASF corporate representative confirmed this policy, and that the delivery driver has responsibility for his or her truck and the hoses used to unload chemicals.  (ECF No. 22-4, PageID #500.)  Therefore, the record does not permit a reasonable jury to find that Defendant controlled a critical variable of the delivery process.

## I.B.    Plaintiffs' Authorities

Plaintiffs argue that this case resembles *Bacha v. Sam Pitzulo Homes & Remodeling, LLC*, 7th Dist. Mahoning No. 17 MA 0097, 2019-Ohio-878.  (ECF No. 22, PageID #217–18.)  There, a State appellate court held that a general contractor— whose employees were removing floorboards at a construction site—owed a duty to a

subcontractor who fell through an opening in that floor because removal of the floorboards was a critical variable under the general contractor's control.  Reversing summary judgment for the defendant, the appellate court determined that removal of the floorboards constituted a critical variable that allowed liability against the general contractor.  *Bacha*, 20019-Ohio-878, ¶¶ 30, 44.

Unlike *Bacha*, the facts in this case demonstrate that Mr. Shiner was in control of his truck, equipment, and activities on the day in question, and that BASF played no active role in Mr. Shiner's work.  Indeed, BASF employees were specifically instructed that they were to let independent contractors like Mr. Shiner do the work as they saw fit and that they were not to interfere with that process.  Moreover, no evidence suggests that anyone from BASF violated that protocol.  Only speculation supports an inference that anyone from BASF touched the hose or exercised control over it.  And floorboards present a critical workplace variable in a way that a hose ordinarily does not.

*     *     *

On a motion for summary judgment, the Court construes the evidence in favor of the non-moving party but does not assess the credibility of any witness or weigh the evidence and determine the truth of the matter.  The non-moving party bears the burden of identifying some material fact genuinely in dispute.  Plaintiffs have not carried that burden here.  The record does not allow a reasonable jury to find that an employee of BASF moved the hose, resulting in Mr. Shiner's injuries, or that BASF otherwise actively participated in or controlled the workplace such that BASF owed Mr. Shiner a duty that can form the foundation of a negligence claim.  Therefore,

18

their negligence claim fails as a matter of law, and Defendant is entitled to a summary judgment.  The parties argue various other grounds regarding Defendant's claims for summary judgment, but the Court need not address them in light of this conclusion.

## II.    Loss of Consortium

Loss of consortium is a derivative claim that cannot stand on its own.  *See Jolly*, 500 F. Supp. 3d at 673 (citing *Paugh v. R.J. Reynolds Tobacco Co.*, 834 F. Supp. 228, 232 (N.D. Ohio 1993)) (dismissing claims for pain and suffering, loss of consortium, and punitive damages because "[t]hose claims only succeed if" the substantive claims survive).  Because Plaintiffs' negligence fails as a matter of law, so too does the derivative consortium claim.

## CONCLUSION

For the foregoing reasons, Court **GRANTS** Defendant's motion for summary judgment (ECF No. 21) and **DIRECTS** the Clerk to enter judgment accordingly.

**SO ORDERED.**

Dated:  September 24, 2021

_____

J. Philip Calabrese
United States District Judge
Northern District of Ohio

19